## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| In re: Timothy Bagley | BK No: 23-10741 |
| Debtor | Chapter 13 |

### DECISION ON DEBTOR'S OBJECTION TO CLAIM NO. 5,
### MOTION FOR WILLFUL CONTEMPT – VIOLATION OF STAY,
### AND CONFIRMATION OF DEBTOR'S THIRD AMENDED PLAN

**I.  Introduction**

Before the Court is debtor Timothy Bagley's objection to Barbara Grady's amended claim for attorney's fees, his motion for contempt against Ms. Grady for alleged violation of the automatic stay, and confirmation of Mr. Bagley's third amended chapter 13 plan, to which Ms. Grady objects. *See* Claim No. 5-3, (the "Amended Claim"); Objection to Proof of Claim No. 5 (Doc. #188, the "Claim Objection"); Motion for Willful Contempt – Violation of Stay (Doc. #168, the "Stay Violation Motion"); Third Amended Chapter 13 Plan (Doc. #184, the "Third Amended Plan"); and Amended Objection to Confirmation of Plan (Doc. #205, the "Plan Objection").

The resolution of these matters hinges on a threshold determination, namely, whether Ms. Grady's Amended Claim is a domestic support obligation ("DSO") as defined by 11 U.S.C. § 101(14A).[1]  If it is, the Stay Violation Motion fails as the quantification of such claim is excepted from the stay under § 362(b)(2)(A)(ii).  Further, the Third Amended Plan fails because it does not provide for priority treatment of the Amended Claim.  Conversely, if the Amended Claim is not a DSO, Mr. Bagley prevails on his Claim Objection, a stay violation occurred, and the Third Amended Plan might be confirmable.

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37, commonly referenced as "BAPCPA."  References to the "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

The Court held a two-day evidentiary hearing on these interrelated matters on July 7 and July 25, 2025.  After considering the testimony and exhibits admitted into evidence, the Court concludes that the Amended Claim is a DSO, there has been no stay violation, and the Third Amended Plan cannot be confirmed.

## II.   Jurisdiction

The Court has jurisdiction over these matters under 28 U.S.C. §§ 1334 and 157(b), and Rule 109 of the Local Rules of the United States District Court for the District of Rhode Island, referring all bankruptcy matters to the bankruptcy court.  This is a core proceeding under 28 U.S.C. § 157(b).

## III.   Procedural Background & Factual Findings

This decision constitutes the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.  The Court's factual findings are derived from the testimony given by Mr. Bagley, Rhonda Crosson, the mother of Mr. Bagley's minor child, Ms. Grady, and the Chapter 13 Trustee as well as the documents admitted into evidence.

### A.    Pre-Petition Events

Ms. Crosson and Mr. Bagley are not married and share a minor child.  Ms. Crosson retained Ms. Grady in July 2014 to obtain a restraining order against Mr. Bagley following a breakdown in their relationship.  Subsequently, Mr. Bagley commenced a child custody action in the Rhode Island Family Court (the "Family Court").  Ms. Crosson has continued to retain Ms. Grady as counsel in the tumultuous and protracted proceedings before the Family Court.

Mr. Bagley was ordered to pay Ms. Crosson $75.00 per week in child support (the "Child Support") for their minor child.  In September 2017, the Family Court also ordered Mr. Bagley to pay Ms. Crosson $64.00 a month for his contribution toward medical and dental insurance

premiums for their child and $272.00 for past due contributions to health insurance premiums.

Additionally, the Family Court ordered him to pay one-half of unreimbursed or uninsured

medical, dental, orthodontic, vision, prescription and counseling costs that are incurred on behalf

of their child.  The $64.00 monthly obligation and these other expenses shall be referred to as the

"Support Related Expenses."  Collectively, the Child Support and Support Related Expenses

shall be referred to as the "Support Obligations."

On January 9, 2019, the Family Court held an evidentiary hearing to determine if Mr.

Bagley had paid the Support Obligations.  The Family Court found that Mr. Bagley had failed to

make the required payments and ordered him to forthwith pay Ms. Crosson $3,022.00 for such

past due obligations, warning that failure to do so would result in his incarceration.  The hearing

was continued to February 25, 2019.  (*See* Exhibit P-1).

After the January hearing, Ms. Grady completed a "Child Support Case Registration and

Payment Form (CSS-1)" on behalf of Ms. Crosson.  (Exhibit 1-A at 1, the "CSS Form").  The

CSS Form listed the Child Support and the monthly insurance premium payments of $64.00,

effective October 16, 2017.  (Exhibit 1-A at 2).  Ms. Grady checked the "full service" box, which

provided that these obligations would be "paid through the Family Court and the Office of Child

Support Services ("OCSS") to provide full enforcement."  (Exhibit 1-A at 3).

At the continued February hearing, the Family Court found Mr. Bagley in willful

contempt for failure to pay the outstanding payments, and he was incarcerated.  (Exhibit P-2).

He was subsequently released and ordered to pay $350.00 to Ms. Crosson.  (Exhibit P-3).  The

Court further enjoined Mr. Bagley from spending his real estate commissions until Ms. Crosson

was paid in full.  (Exhibit P-3).  In late April 2019, the Family Court held a follow-up hearing on

Mr. Bagley's failure to pay Support Obligations and Ms. Crosson's related motion to hold Mr.

Bagley in contempt.  (Exhibit P-3).  Once again, the Family Court found Mr. Bagley in willful

contempt for failing to pay his past-due Support Obligations and spending his real estate

commissions.  The Family Court directed Ms. Grady to submit a request for payment of counsel

fees.  Mr. Bagley was then incarcerated a second time.  The Court memorialized its findings and

ruling in a May 2019 order.  (Exhibit P-3).

On June 19, 2019, the Family Court held a hearing on the nonpayment of the Support

Obligations and Ms. Grady's request for counsel fees.  Following that hearing, the Family Court

ordered Mr. Bagley to pay Ms. Crosson's attorney fees of $2,945.00.  (Exhibit P-4, the "July

2019 Order").  Mr. Bagley failed to comply.  In February 2021, Ms. Crosson again moved in the

Family Court to enforce its prior orders and hold Mr. Bagley in contempt.  (Exhibit 1-F).

The Family Court commenced a trial in July 2022 concerning Mr. Bagley's failure to pay

Support Obligations and Ms. Crosson's attorney's fee request.  This trial spanned numerous

dates and eventually concluded on February 27, 2023 (the "Trial").  Ms. Grady then moved for

an assessment of fees for her services relating to the Trial.[2]

On March 13, 2023, the Family Court issued an order finding Mr. Bagley in willful

contempt for his failure to pay court ordered orthodontic expenses, unreimbursed health

insurance premiums and the previously ordered counsel fee.  (Exhibit 1-D, the "March 2023

Order").  Yet again, the Family Court incarcerated Mr. Bagley pending payment of ordered

payments totaling $6,363.00.  At some point during the trial proceedings Mr. Bagley made

substantial payment towards this outstanding amount, but not the full amount.  He was released

from incarceration with the condition that he pay $1,500.00 towards Ms. Grady's attorney's fees.

---

[2] Ms. Crosson and Mr. Bagley agreed to a consent order resolving certain issues about Ms. Crosson's use of a health savings account towards payment of medical and orthodontic expenses for their child, but the consent order did not alter Mr. Bagley's previously ordered Support Obligations or the required payment of Ms. Grady's attorney's fees.

(Exhibit 1-G, the "May 2023 Order").  Although Mr. Bagley made that payment, he remained

delinquent on other ordered Support Obligations while also pursing an appeal of the March 2023

Order and filing motions to delay or alter the required payments.  Consequently, Ms. Grady

continued to accrue fees in pursuing past-due Support Related Expenses and court-ordered fees

incurred on Ms. Crosson's behalf.  Due to the pending appeal, the Family Court had been unable

to quantify the additional fees Ms. Grady had accrued as of the filling of Mr. Bagley's

bankruptcy case.

　　　　　B.　　　The Bankruptcy Filing and Post-Petition Events

　　　　Mr. Bagley filed his chapter 13 bankruptcy petition on November 27, 2023.  On

Bankruptcy Schedule A/B, Mr. Bagley listed his residence, and on Bankruptcy Schedule D, he

listed a claim of $225,623.00, secured by his residence.  On Bankruptcy Schedule E/F, he listed

the Internal Revenue Service ("IRS"), Ms. Crosson, and Ms. Grady as unsecured creditors.

(Exhibit B-1).  He scheduled a claim of Ms. Crosson of $1,915.00 for "orthodontic expenses"

and a claim of Ms. Grady for attorney's fees of $9,930.00.  (Exhibit B-1).

　　　　Ms. Grady timely filed a proof of claim for $2,945.00 based on "court-ordered attorney

fee award per order of 6/19/19 plus interest" entitled to priority as a DSO under §§ 101(14A) and

507(a)(1)(A).  See Claim No. 5-1 (the "Initial Claim").[3]  She did not attach any supporting

documents to the claim.  Mr. Bagley objected to Ms. Grady's Initial Claim (Doc. #37).

　　　　The Trustee objected to Mr. Bagley's initial chapter 13 plan (Doc. #28), on the grounds

(among other things) that Mr. Bagley had not filed his federal and state tax returns, and the plan

---

[3] The Initial Claim included two copies of Official Form 410 (the Proof of Claim Form).  The second copy was filed
as an attachment and again listed a claim of $2,945.00 for "court-ordered attorney fee award per order of 6/19/19
plus interest."  In the claim form attachment, she identifies the claim as a DSO under § 101(14A) entitled to priority
under § 507(a)(1) or (a)(1)(B).  See Claim 5-1, Attachment 1.  Based on the testimony at the evidentiary hearing and
the record in this case, the Court finds that Ms. Grady clearly intended to seek priority treatment of her claim.

was not feasible because Mr. Bagley's disposable income was insufficient to meet the proposed

plan payments. The Trustee amended that objection to add that Mr. Bagley had failed to make

all the required plan payments (Doc. #42). While these objections were pending, the creditor

holding the mortgage against Mr. Bagley's residence moved for approval of a loan modification

agreement with Mr. Bagley. (Exhibit L, "First LM Motion"). The First LM Motion confirmed

that Mr. Bagley was in default under the terms of the note and mortgage and proposed a loan

modification whereby the monthly mortgage payment increased by approximately $500.00.

(First LM Motion at 6). The Court approved the First LM Motion (Doc. #61) and scheduled a

hearing on the Claim Objection. Prior to that hearing, however, Mr. Bagley filed an amended

plan. In fact, his proposed plan has gone through four iterations to date, in part due to objections

filed by the Trustee (along with Ms. Grady), substantial estimated IRS and state tax claims

arising from Mr. Bagley's failure to file his required tax returns, and a change in his

employment.

The Court held a hearing on July 17, 2024, on Mr. Bagley's first amended plan and the

Trustee's objection. Ms. Grady appeared and advised the Court of her intention to amend her

claim once quantified by the Family Court to include additional fees she had incurred as of the

petition date. Without having sufficient information about the nature or details of her claim, the

Court indicated that Ms. Grady would need to seek relief from the automatic stay to do so. The

Court also acknowledged the concurrent jurisdiction of the Family Court and noted Mr. Bagley's

inability to relitigate the amounts of such claims in the Bankruptcy Court.

After retaining counsel to represent her in the bankruptcy proceeding, Ms. Grady moved

for relief from the automatic stay under § 362(b)(2)(A)(ii) to quantify her pre-petition fees in the

Family Court (Doc. #81, "Motion for Relief"). Mr. Bagley opposed the motion (Doc. #98).

6

During the August 14, 2024, hearing on the Motion for Relief the Court voiced its concern that the motion lacked sufficient detail to warrant stay relief.  In response, Ms. Grady's counsel stated that stay relief was not necessary and that the motion was only filed because of the Court's statement during the earlier hearing.  Counsel opined that Ms. Grady could move in the Family Court for an assessment of her fees without stay relief because § 362(b)(2)(A)(ii) excepts such actions from the stay.  Based on counsel's statements, the Court denied the motion for stay relief.  However, the Court clarified that it was not ruling on the merits of whether stay relief was required or the applicability of the asserted stay exception.  It further agreed that the Family Court has concurrent jurisdiction over the determination of whether such fees are DSOs as defined by the Bankruptcy Code.

During the pendency of this case, the Court held periodic preliminary hearings on the status of Mr. Bagley's various chapter 13 plans, the status of his tax returns and the Claim Objection.  However, the Court deferred holding an evidentiary hearing on plan confirmation or the Claim Objection until they were ripe for consideration.

On December 3, 2024, Ms. Grady filed an amended motion for attorney's fees in the Family Court seeking to quantify the fees she had incurred for the Trial and the Family Court's March 2023 Order.  She also sought a declaration that such fees, along with fees incurred post-petition related to the bankruptcy case, constitute DSOs.  In support, Ms. Grady submitted an amended affidavit of attorney's fees, which included two itemized statements of services rendered to Ms. Crosson in the Family Court proceedings from June 2022 through October 2024 in the total amount of $15,568.00.  (Doc. #168 at 11; Exhibit 1-E).  The components of that fee request are comprised of both pre-petition and post-petition services.  The pre-petition services rendered from June 2022 through March 2023 totaled $11,070.00.  These fees relate to the Trial

on multiple motions to adjudge Mr. Bagley in contempt for nonpayment of the Support

Obligations (Doc. #168 at 11-14; Exhibit 1-E at 3-4).  The post-petition services rendered from

January 23, 2024, through October 22, 2024, totaled $4,498.00.  These fees relate to Mr.

Bagley's bankruptcy proceeding (Doc. #168 at 15-16; Exhibit 1-E at 5-6).

 After Ms. Grady filed her fee request motion in Family Court, Mr. Bagley filed the Stay

Violation Motion in this Court.  On April 9, 2025, the Family Court held a hearing on Ms.

Grady's fee request and later issued a detailed order finding, among other things, that the pre-

petition fees of $11,070.00 incurred by Ms. Grady were for her "efforts to enforce the prior

Orders of this Court related to payment of child support, uninsured medical and orthodontic

expenses for the minor child, health insurance premiums for the minor child and for payment of

previously ordered counsel fees."  (Exhibit 1-C; Exhibit N, Part 2 at 1-3) (the "DSO Order").

The Family Court declined to grant Ms. Grady's request for additional fees of $4,498.00 relating

to the bankruptcy case but awarded her $1,800 in legal fees for appearing at the April 9 hearing

"to establish and quantify her legal fees related to the domestic support obligations."  DSO Order

at ¶ 4.

 In sum, the Family Court found that Mr. Bagley "owe[ed] a total of $12,870.00 as a

domestic support obligation under the bankruptcy code for legal fees due to Attorney Barbara

Grady as of April 9, 2025."  DSO Order at ¶ 6.  The Family Court also expressly stated in the

DSO Order that "the sole purpose of the [April 9] hearing was to establish and quantify the legal

fees incurred by [Ms. Crosson] in connection with her efforts to enforce existing court orders for

child related expenses, no enforcement action will be taken."  DSO Order at ¶ 1.  Finally, the

Family Court concluded that its assessment of the fees was excepted from the automatic stay

under § 362(b)(2)(A)(ii) because such fees are DSOs (DSO Order at ¶ 6), but that "enforcement of said fee award is stayed" at this time (DSO Order at ¶ 7).

Shortly thereafter, Ms. Grady amended her claim, Claim No. 5-2, amending that claim further by filing the Amended Claim on April 21, 2025 (Claim No. 5-3; Exhibit N), seeking $12,870.00 in attorney's fees for "child support, and contempt action incurred on behalf of mother of child, Rhonda Crosson."[4]  Ms. Grady attached the DSO Order to the Amended Claim.

Further complicating matters, Mr. Bagley amended his Bankruptcy Schedules I and J (Doc. #177; Exhibit J), updating his employment as a medical sales representative and listing gross monthly wages of $4,500.00, and take-home pay of $3,629.00 (Doc. #177; Exhibit J at 1-2).  On Bankruptcy Schedule J, Mr. Bagley listed a monthly mortgage expense of $2,394.00 and monthly net income of $196.00.  (Doc. #177; Exhibit J at 3-5).

On May 23, 2025, Mr. Bagley filed the Third Amended Plan (his fourth chapter 13 plan). This plan proposes monthly payments of $225.00 for 42 months; turnover of any tax returns during the plan term that exceed $500.00; an increase of the monthly plan payment if Support Obligations end (as of the hearing date his child was 17 years old); maintenance of monthly mortgage payments; full payment of the IRS and the Rhode Island Division of Taxation priority claims totaling $11,462.00; and a modest dividend to unsecured creditors.  As noted, Ms. Grady objected to the plan.  (Doc. #186).

Mr. Bagley objected to Ms. Grady's Amended Claim (Doc. #188), and she filed a response (Doc. #195).  She later filed the Plan Objection (Doc. #205) and moved to convert the case to chapter 7 (Doc. #207).  While all of this was pending, in June 2025, the mortgage holder

---

[4] The only difference between Claim No. 5-2 and the Amended Claim is that the Amended Claim states that it is entitled to priority under § 507(a)(1)(A) or (B) as a [DSO] as defined by under §§ 101(14A).

moved for approval of a second loan modification agreement with Mr. Bagley (Doc. #194; Exhibit M, "Second LM Motion").  Under that agreement, the monthly mortgage payment would increase to $2,379.49 (Second LM Motion at 4, 6).  For unknown reasons, the mortgagee withdrew the Second LM Motion on August 8, 2025.

      C.    *The Evidentiary Hearing and Post-Hearing Events*

After this lengthy but necessary recitation, the Court can now move on to the evidentiary hearing on these matters.

Ms. Grady testified that she filed the Amended Claim seeking $12,870.00 as a creditor in her own right.  She emphasized the fees listed in her Amended Claim were incurred in relation to the Trial on motions to enforce the Support Obligations which Mr. Bagley repeatedly failed to pay.  She explained that the fees were incurred for services rendered during the period of July 2022 through February 2023 (Exhibit 1-D), as well as for her time expended at the April 9, 2025, Family Court hearing.  Ms. Grady clarified that the fees did not include fees Mr. Bagley had paid to purge himself of prior contempt orders for non-payment of Support Obligations.  *See* May 2023 Order.  Ms. Grady testified that the billing statement for fees and costs totaling $11,070.00 was for services rendered pre-petition, despite two entries erroneously dated "3/21/24" and "3/23/24."  She explained that those entries were in fact for service rendered on "3/21/23" and 3/23/23," and that she attended hearings before the Family Court on those dates to enforce the Family Court's payment directive per the March 2023 Order.

In her testimony, Ms. Grady noted that although she had earlier sought to quantify the additional fees incurred after the Trial's conclusion in February 2023, a hearing could not proceed because of Mr. Bagley's appeal of the March 2023 Order.  So, on the petition date Ms. Grady had motions pending in the Family Court to assess the additional pre-petition fees she had

incurred during the Family Court proceedings because of Mr. Bagley's non-compliance with various support orders.

As to the allegations of a stay violation, she believed that her motion in the Family Court to quantify her fees was excepted from the automatic stay by § 362(b)(2)(A)(ii) as the fees constitute DSOs.  Ms. Grady emphasized that she had sought continuances of other matters pending in the Family Court that she believed were stayed by Mr. Bagley's bankruptcy, such as a motion to sell his residence to satisfy outstanding Support Obligations.

Ms. Grady confirmed that Mr. Bagley was present for the April 9 hearing and had an opportunity to object and examine witnesses.  Regarding the total fee award of $15,568.00 she had sought in Family Court, Ms. Grady testified that she believed all the fees were DSOs but confirmed that the Family Court did not award her the $4,498.00 in fees incurred in connection with the bankruptcy proceeding.  The Court finds Ms. Grady's testimony credible.

When questioned about the CSS Form, Ms. Grady noted that once the form is submitted, the individual entitled to support obligations (be it for spousal or child support) receives assistance through the OCSS in the enforcement and collection of court-ordered support payments.  She was very clear that the claim to support payments, however, remains with the individual entitled to such payments, characterizing the OCSS as a "pass through" for court-ordered support payments and medical insurance obligations.

Ms. Crosson's testimony corroborated much of Ms. Grady's testimony about the repeated need to seek enforcement of the Family Court orders through the filing of motions to hold Mr. Bagley in contempt of those orders.  Ms. Crosson testified that Mr. Bagley had "always been in arrears" in his payments ordered by the Family Court, and his non-compliance resulted, on more than one occasion, in his incarceration.  To collect such delinquent payments, she continued to

employ the services of Ms. Grady to enforce these orders and obtain payment.  She confirmed

Ms. Grady's testimony about the delays in enforcement of the Family Court payment orders due

to Mr. Bagley's appeal of the March 2023 Order.  Ms. Crosson also confirmed that the fees

charged to her by Ms. Grady related to the Trial for non-payment of the Support Obligations, and

did not include any services concerning child custody issues.  The Court finds Ms. Crosson's

testimony credible.

For his part, Mr. Bagley declined to present evidence or testimony to advance

confirmation of the Third Amended Plan, focusing only on the Claim Objection and the Stay

Violation Motion through his questioning of Ms. Grady and Ms. Crosson.  The issues regarding

plan confirmation, however, were addressed by Ms. Grady through cross examination of Mr.

Bagley as an adverse witness.

Upon extensive questioning about his income and living expenses, Mr. Bagley's answers

were vague, and frankly, the Court finds some of his responses not credible. For instance, despite

what he listed on Bankruptcy Schedule J, the documents he produced in response to Ms. Grady's

subpoena did not show regular monthly payments of his water bill.  Mr. Bagley was unsure how

much his water bills were and stated that he only paid them "when convenient."  Regarding his

failure to produce utility bills, Mr. Bagley testified that he has not had electricity at his house

since January 2025, because he did not need electricity, even though his teenage son was

residing with him at the time.  He also testified that he does not pay for a cell phone, that his

mother pays for his car insurance, and that he had reduced his living expenses to make his plan

payments to the Trustee.  Additionally, Mr. Bagley was unable to recall his income during

January 2025 through March 2025.  Moreover, although he stated that with his new employment

he was entitled to sales commissions, he had no idea how much that was or when he would

receive them.  He testified that he does not look at his bank statements and that he had no idea

what was in his bank account.  Nor did he recall the last time he had looked at a bank statement

or checked his account balances.

Finally, when asked about the status of his mortgage Mr. Bagley reluctantly

acknowledged that he was delinquent in his payments.  He admitted that he had fallen in arrears

twice during the pendency of his case, most recently this year.  He explained that he took pro-

active steps with the mortgagee to address these defaults.  He obtained the first loan modification

agreement in April 2024, resulting in a substantial increase in the monthly payments.  Mr.

Bagley stated that he when he fell behind again, he contacted the lender who agreed to capitalize

the post-petition mortgage arrearage of $12,000.00 into the outstanding loan.  As previously

noted, the Second LM Motion filed in June 2025 was withdrawn by the mortgagee before the

Court could consider it.

Addressing plan confirmation, the Trustee testified that even though Mr. Bagley was

current in his plan payments, he had reservations about the feasibility of the Third Amended Plan

based on Mr. Bagley's testimony at the hearing.  He further testified that the Third Amended

Plan would not be confirmable if Ms. Grady's Amended Claim is a DSO.

With that backdrop, the Court will address the merits of each of these matters.

**IV.    The Claim Objection**

Before delving into whether Ms. Grady's Amended Claim is a DSO, the Court must

address Mr. Bagley's assertion that it is a new claim and, therefore, must be disallowed as

untimely.

13

A.      *Filing Proofs of Claims*

The requirements for filing and allowance of proofs of claims are set forth in both the

Bankruptcy Code and Bankruptcy Rules.  *See Municipality of Carolina v. González (In re*

*González),* 490 B.R. 642, 647 (B.A.P. 1st Cir. 2013).  To receive a distribution under a chapter 13

plan, a creditor holding a pre-petition claim (whether secured or unsecured) must timely file a

proof of claim.  *See* Bankruptcy Rule 3002(a); *see also* 11 U.S.C. § 101(5)(A) (defining "claim"

as a "right to payment, whether or not such right is reduced to judgment, liquidated,

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable,

secured, or unsecured").  A properly filed claim constitutes "prima facie evidence of the claim's

validity and amount."  Fed. R. Bankr. P. 3001(f).  "If, however, the claimant fails to allege facts

in the proof of claim that are sufficient to support the claim, *e.g.* by failing to attach sufficient

documentation to comply with [Bankruptcy Rule] 3001(c), the claim is not automatically

disallowed; rather, it is merely deprived of any *prima facie* validity which it could otherwise

have obtained."  *In re Kilgore Meadowbrook Country Club, Inc.*, 315 B.R. 412, 417 n.7 (Bankr.

E.D. Tex. 2004) (citing *In re Los Angeles Int'l Airport Hotel Assoc.,* 196 B.R. 134, 139 (B.A.P.

9th Cir. 1996)).

A claim objection "does not deprive the proof of claim of presumptive validity unless the

objection is supported by *substantial evidence*."  *Juniper Dev. Grp. v. Kahn (In re Hemingway*

*Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993).  Nevertheless, Ms. Grady, as "the party seeking

priority treatment of the [c]laim . . . carries the ultimate burden of establishing that [she is] so

entitled."  *In re Corson*, 629 B.R. 1, 4 (Bankr. D.N.H. 2021) (citing *Mason v. Official Comm. of*

*Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 41-42 (1st Cir. 2003) (stating

that "statutory priorities are narrowly construed, and the burden of proving entitlement rests with

14

the party seeking it."); *In re Plourde*, 418 B.R. 495, 507 (B.A.P. 1st Cir. 2009) ("[E]ach creditor

must demonstrate its entitlement to distribution at a particular level.").

In a chapter 13 case, tardily filed proofs of claims are disallowed unless they meet one of

the exceptions set forth in Bankruptcy Rule 3002(c).  But if the amendment of a claim is proper

and the original claim timely filed, then the amended claim relates back to the original claim and

is deemed timely filed.  *See In re Martinez*, 513 B.R. 779, 784-85 (Bankr. D.P.R. 2014)

(discussing permissibility and mechanics of amending a timely filed proof of claim).

B.      *Amendments to Proofs of Claims*

Amendments of timely filed proofs of claims are liberally allowed.  *See In re*

*Kolstad,* 928 F.2d 171, 175 (5th Cir. 1991) (holding that late-filed amendments to a timely filed

claim must be "liberally permitted to 'cure a defect in the claim as originally filed, to describe

the claim with greater particularity or to plead a new theory of recovery on the facts set forth in

the original claim,'" assuming the amendments do not "set forth wholly new grounds of

liability." (quoting *United States v. International Horizons, Inc. (In re International Horizons,*

*Inc.)*, 751 F.2d 1213, 1216 (11th Cir. 1985)).  "Amendments to proofs of claim timely filed are to

be freely allowed, whether for purposes of particularizing the amount due under a previously-

asserted right to payment, or simply to cure technical defects in the original proof of claim."

*Woburn Associates v. Kahn (In re Hemingway Transp. Inc.)*, 954 F.2d 1, 10 (1st Cir. 1992).

Whether to permit "an amendment to a timely-filed proof of claim rests with the sound

discretion of a bankruptcy judge."  *In re Martinez*, 513 B.R. at 784.  "[A]llowance of an

amended proof of claim is an equitable determination often approached using a two-part test—

(1) was a timely similar claim asserted against the bankruptcy estate by a prior formal proof of

claim or informal proof of claim; and (2) is it equitable to permit the amendment.'"  *In re Rios*

*Vargas*, 664 B.R. 198, 204–05 (Bankr. D.P.R. 2024) (quoting Keith M. Lundin, Lundin on

Chapter 13, § 133.4, at ¶ [4], LundinOnChapter13.com (last visited August 27, 2024)).

The First Circuit has fine-tuned the framework for bankruptcy courts in this circuit to

utilize when evaluating an amendment to a proof of claim. *See In re Hemingway Transp. Inc.,*

954 F.2d at 10.

> [Bankruptcy courts] must scrutinize both the substance of the
> proposed amendment and the original proof of claim to ensure that
> the amendment meets three criteria. First, the proposed amendment
> must not be a veiled attempt to assert a distinctly new right to
> payment as to which the debtor's estate was not fairly alerted by the
> original proof of claim. Second, the amendment must not result in
> unfair prejudice to other holders of unsecured claims against the
> estate. Third, the need to amend must not be the product of bad faith
> or dilatory tactics on the part of the claimant.

*Id*. (citations omitted).

"[A]s a general rule, amendments intended merely to *increase* the amount of a claim

grounded in the same *right to payment* are not considered 'new' [or superseding] claims under

the Code." *Id*.  Thus, "the fact that a subsequent proof of claim is for a larger sum than that

earlier proof does not prevent the latter from amending the former."  *In re Crane Rental Co.,*

*Inc.*, 341 B.R. 118, 121 (Bankr. D. Mass. 2006) (quoting *In re Hanscom Retail Foods, Inc.*, 96

B.R. 33, 35 (Bankr. E.D. Pa. 1988)).  But if a claimant seeks to alter the underlying nature of the

claim, the amendment constitutes a new claim separate from the original filed claim.  *See In re*

*Metro Transportation, Co.*, 117 B.R. 143, 148 (Bankr. E.D. Pa 1990) (stating "where a claimant

attempts to change the nature of a proof of claim, such as when the taxing authority attempts to

increase its proof of claim by adding different types of taxes . . . , such amendments have

generally been disallowed.").

As to the second prong, "unfair prejudice" cannot be established "merely by the fact that the estate will be required to pay a claim that it might have otherwise eluded." *In re Kilgore Meadowbrook Country Club, Inc.*, 315 B.R. at 423 (stating that "the allowance of the amendment [does not] cause any unfair prejudice to the [d]ebtor itself since it was not deprived of its ability to fully and fairly defend the … claim"); *see also Gens. v. Resolution Trust Corp.,* 112 F.3d 569, 575 (B.A.P. 1st Cir 1997) (rejecting debtor's argument that "allowing the . . . amendment prejudices unsecured creditors, who may receive less under any reorganization plan that would have been received were the … claim not allowed."). Indeed, "something more than mere creditor disappointment is required to preclude amendment." *Gens.,* 112 F.3d at 575*; see also In re Stoecker,* 5 F.3d 1022, 1028 (7th Cir. 1993) (explaining that *"*[t]o say that an error is prejudicial means not that if the error is corrected someone will lose, which is almost always true, but that the error itself imposed a cost, as by misleading someone. Obviously, there will be losers if the bank's claim is allowed, because the pool of assets available to the other creditors will be diminished, but the fact that the proof of claim failed to comply with [Bankruptcy] Rule 3001 did not mislead or otherwise harm anyone.").

For the last prong of this test, there must be more than delay in the filing of the amendment or increasing the amount of the claim. The focus is upon the claimant's improper conduct, such as dilatory tactics, or efforts to mislead, deceive or take unfair advantage by filing the amended claim. "In the context of claim amendments, . . . the case law on bad faith and dilatory tactics more precisely turns on whether there is any 'evidence whatever from which to infer' that the claimant 'intentionally refrained, out of any improper or dilatory purpose' from providing in the original proof of claim the information set forth in the amended claim . . . . Not every delay amounts to bad faith or suggest a dilatory motive." *Rios Vargas v. Planet Home*

*Lending, LLC (In re Vargas)*, 671 B.R. 831, 841-42 (B.A.P. 1st Cir. 2025) (quoting *In re*

*Hemingway Transp. Inc.*, 954 F.2d at 12).

     *C.*     *Allowance of the Amended Claim*

     The Court finds that Ms. Grady's amendment of her Initial Claim is permissible.  The

amendment does not alter the nature of the claim asserted in the Initial Claim; both are based

upon fee awards by the Family Court after Ms. Crosson repeatedly had to pursue enforcement

and collection of unpaid Support Obligations.  The Court reaches this determination in view of

the protracted Family Court contempt proceedings necessitated by Mr. Bagley's failure to make

the payments required by the that court's July 2019 and March 2023 Orders, and the delay in the

assessment of the amount of Ms. Grady's fees occasioned by Mr. Bagley's appeal of the latter

order.  It is clear that the Amended Claim "particulariz[ed] the amount due under a previously-

asserted right to payment."  *In re Hemingway Transp. Inc.,* 954 F.2d at 10.

     Moreover, there is nothing inequitable in permitting the amendment of the Initial Claim.

"The overriding purpose of proofs of claim and the rules of law that require their timely

submission is to provide a debtor's creditors and other parties in interest with notice of the claims

against the estate."  *In re FTX Trading Ltd.*, 669 B.R. 298, 306 (Bankr. D. Del. 2025).  Here, Mr.

Bagley can hardly claim surprise or prejudice by the Amended Claim.  He was an active

participant in multiple Family Court proceedings for his contempt of the support orders.  And he

knew that the amount of Ms. Grady's fees significantly exceeded the amount stated in the Initial

Claim, having listed her on his bankruptcy schedules as an unsecured creditor with an *undisputed*

claim for "attorneys fees" in the amount of $9,930.00.

     Nor can he complain about the delay in the quantification of Ms. Grady's fees caused by

his appeal of the March 2023 Order.  Ms. Grady's delay in filing the Amended Claim was not the

result of bad faith or dilatory tactics. *See In re FTX Trading Ltd.*, at 307-308 (concluding that

"the evidence suggests that the delay in filing the Amended POC was, in large part, caused by

the Debtors themselves.").  Furthermore, Ms. Grady notified the Court, Mr. Bagley and the

Trustee of her intention to amend the Initial Claim once the Family Court assessed the amount of

fees due based on the contempt motions previously heard by that court.  Ms. Grady could not list

or document in her Initial Claim the full amount of fees due because of Mr. Bagley's repeated

non-compliance with the Family Court's orders.  This Court would have appreciated a more

detailed explanation from Ms. Grady about the Family Court litigation and the nature of her

claim at the outset, thereby dispensing with the Court's concerns regarding the automatic stay.

But it is satisfied that neither the need to amend the Initial Claim nor the delay in filing the

Amended Claim was the result of any malfeasance or an attempt to gain an unfair advantage.

Finally, the Court concludes that there is no unfair prejudice in permitting the

amendment.  Mr. Bagley's plan has not been confirmed.  The delay in holding a confirmation

hearing is largely attributable to Mr. Bagley's failure to timely file tax returns, failure to provide

for treatment of the secured claim against his residence in earlier versions of his chapter 13 plan,

and changes in his financial circumstances.  Further, the record reflects delay on Mr. Bagley's

part in responding, and then only partially, to discovery requests propounded by Ms. Grady in

connection with the Claim Objection and plan confirmation.[5]

The circumstances in this case are a far cry from those in which creditors are prejudiced

by unreasonable or unfair delay tactics in amending a claim.  *See In re Martinez*, 513 B.R. at

782, 786-87) (finding creditor's claim amendment seeking to increase the secured portion of its

---

[5] For example, Mr. Bagley sought to quash discovery propounded by Ms. Grady, including a subpoena for his deposition.  He also repeatedly requested extensions of time to respond to such discovery requests and did not provide all the required documents, despite being ordered to do so by this Court.  These actions also contributed to the considerable delay in scheduling a plan confirmation hearing.

claim was an untimely dilatory tactic that unfairly prejudiced creditors where claimant had not objected to the debtor's plan and filed the amendment after all plan payments and disbursements had been made); *see also In re Davis*, No. 02–69077, 2007 WL 2126261, *2 (Bankr. E.D. Va. 2007) (creditors four-year delay in amending its claim to account for a deficiency upon foreclosure as an unsecured nonpriority claim was untimely and unfairly prejudiced the debtor).

In short, the amendment of the Initial Claim is permissible, and the Amended Claim is timely because it relates back to the Initial Claim.

The Court now must determine whether the Amended Claim qualifies as a DSO entitled to priority treatment under the Third Amended Plan.  The Court concludes that the fees awarded to Ms. Grady are in fact DSOs under § 101(14)(A).

>    D.    *Priority Treatment of the DSO Claim*

The definition of a DSO is found in § 101(14A).  Under that section, a DSO is:

>    (A) owed to or recoverable by – (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or (ii) a governmental unit;
>
>    (B) in the nature of alimony, maintenance, or support . . . of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
>    (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of– (i) a separation agreement, divorce decree, or property settlement agreement; [or] (ii) an order of the court of record; . . . and
>
>    (D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A).

DSO claims are only afforded priority status if the debt was incurred pre-petition. *In re Andrade*, 662 B.R. 898, 900–01 (Bankr. S.D.N.Y. 2024). "Pre-petition domestic support obligations enjoy first priority status under [§] 507(a)(1), and a creditor may file a proof of claim for such obligation." *Id.* at 901. In turn, to qualify for priority treatment, § 507(a)(1)(A) requires the debt "as of the date of the filing of the petition" to be "owed to or recoverable by a spouse, former spouse, or child of the debtor, or such child's parent, legal guardian, or responsible relative, without regard to whether the claim is filed by such person . . . .'" If afforded priority status, § 1322(a)(2) requires full payment of the DSO through deferred payments under a chapter 13 plan, absent an agreement otherwise. *Id*.

Proofs of claims for a post-petition DSO are not allowable by virtue of § 502(b)(5), which disallows a claim that "is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under [§] 523(a)(5)." *Id*. *See* 11 U.S.C. §§ 502(b)(5) and 523(a)(5). For such post-petition DSO claims, different provisions of chapter 13 apply.

"Determining whether a claim is a domestic support obligation entitled to priority treatment is a question of federal law." *In re Corson*, 629 B.R. at 5.[6] Under federal law, that examination "depends not on the label attached to the obligation but on the purpose it was intended to serve by the court that fashioned it." *In re Angelo*, 480 B.R. 70, 86 (Bankr. D. Mass. 2012). As the Court in *In re Babineau*, explained, the inquiry focuses on the totality of the circumstances:

---

[6] The Court's analysis is further informed by case law construing DSOs under § 523(a)(5), which excepts from discharge debts for DSOs. *See* 11 U.S.C. § 523(a)(5). Indeed, "[t]he examination to determine whether the debt is a domestic support obligation under § 507(a)(1)] is the same as a § 523(a)(5) inquiry as they both seek to determine if the obligation is in the nature of 'alimony, maintenance or support.'" *Smith v. Pritchett (In re Smith)*, 398 B.R. 715, 721 (B.A.P. 1st Cir. 2008), aff'd, 586 F.3d 69 (1st Cir. 2009); *see also* 11 U.S.C. § 507(a)(1).

> Courts look at the totality of circumstances of a particular case in deciding whether an obligation was intended to qualify as a DSO, examining a range of factors including: the language used by the state court in the document establishing the obligation, whether the property award appears to "assuage need" as discerned from the structure of the award, and the financial circumstances of the recipients at the time of the relevant agreement.

2012 BNH 012, 2018 WL 6718611, at *3 (Bankr. D.N.H. 2018).

Applying this test to the present case, "the classification of ancillary obligations, such as attorneys' fees, should follow the classification of the primary obligation in determining their nature . . . ." *Id.* Importantly, a court "is not bound by titles and classifications of obligations in the pleadings and instead looks at the intent of the order awarding attorney's fees and how the award was intended to function." *Id*. at *4.

The parties dispute, either directly or impliedly, whether the requirements of subsections (A), (B), (C) and (D) of §101(14A) are satisfied. Ms. Grady maintains that the attorney's fees sought in her Amended Claim are DSOs because they were incurred on Ms. Crosson's behalf to enforce prior Family Court support orders. Conversely, Mr. Bagley asserts that the Amended Claim is not a DSO because: (a) an "attorney" is not an enumerated entity listed in §101(14A), (b) he was never married to his child's mother, (c) there is no finding in the March 2023 Order that he was in "willful and malicious" contempt of the Family Court orders, and (d) Ms. Crosson "assigned" her rights to recover and enforce the Child Support to a governmental entity.

These arguments are not supported by the Code or applicable law. Courts disagree about whether a debt owed to an entity other than one enumerated in § 101(14A)(A) qualifies as a DSO. This Court is persuaded by the cases that do not construe the phrase "owed to or recoverable by" one of the enumerated payees in the statute as requiring the claim to also be *payable* to the same. The discussion in *In re Angelo* is particularly persuasive:

> The fact that [the attorney fee award] is payable to [the former spouse's attorney] does not disqualify it from being a domestic support obligation. Each dollar paid on the [attorney fee award] satisfies a dollar of [the former spouse's] obligation to [her attorney]. The [attorney fee award] entered in a divorce proceeding to which [the former spouse] but not [her attorney] was a party, and the Contempt Judgment for its nonpayment was entered on a complaint brought in her name, not [her attorney's]. Therefore, it is an obligation for the benefit of [the former spouse], and payments on it to [her attorney] are, in effect, payments to [the former spouse]. The [attorney fee award] is therefore 'owed to and recoverable by' [the former spouse] within the meaning of the definition of domestic support obligation . . . .

480 B.R. at 86 n.14.  *See In re Rogowski*, 462 B.R. 435, 444 (Bankr. E.D.N.Y. 2011) (discussing pre-and post-BAPCPA cases interpreting § 523(a)(5) language and overruling "[d]ebtor's objection to [claim of former spouse's attorney] based on the claim being payable to the attorney rather than directly to the [d]ebtor's former spouse.").

Nor is the fact that Mr. Bagley and Ms. Crosson were never married relevant.  The statutory DSO definition expressly includes child support obligations and does not preclude attorney's fees awarded in connection with the enforcement and collection of delinquent child support obligations.  *In re Rugiero*, 502 F. App'x 436, 439 (6th Cir. 2012).  The rationale of the *Rugiero* court is also compelling:

> Nothing in the statute requires the "child's parent[s]" to be married at the time of the award or indeed ever to have been married . . . [and] [n]othing in the statute precludes an attorney's fee award from being treated as "in the nature of . . . support." Were it otherwise, a litigious boyfriend, to use one example that comes to mind, could make life miserable for his girlfriend by waging a costly custody dispute over their children, one that the girlfriend might not be able to fend off based on her earnings (and other child-support payments) alone. That is why many courts have treated fee awards as "support" payments; it is the only way to allow some parents to vindicate their rights in court.

*Id.*

The Family Court was correct in determining that the $12,870.00 fee award to Ms. Grady

is indeed a DSO within the parameters of § 101(14A)(A) and (B).  Requiring Mr. Bagley to pay for the attorney fees Ms. Crosson incurred in pursuit of the court-ordered Support Obligations is "in the nature of support" of their minor child.  *See In re Rogowski*, 462 B.R. at 444.

Similarly, the Support Obligations fall within the scope of § 101(14A)(C).  The fees were "established or subject to establishment before, on, or after" the filing of Mr. Bagley's bankruptcy petition.  11 U.S.C. § 101(14A)(C).  Because the Family Court ordered Mr. Bagley to pay Ms. Grady's attorney's fees incurred pre-petition, and because under the circumstances the Family Court could not assess the fees until after the petition filing, both Ms. Grady's pre-petition and post-petition fee awards qualify as DSOs.

Lastly, the Court finds that Mr. Bagley's reliance on § 101(14A)(D) is incorrect; it is simply inapplicable here.  First, the Amended Claim is held directly by Ms. Grady.  Second, for Mr. Bagley's edification, the OCSS is a governmental agency, and there was no assignment of Ms. Crosson's claim to it or to any other entity.  Ms. Grady's uncontradicted and unequivocal testimony is that Ms. Crosson retained her claim and right of payment to the Support Obligations.  The submission of that form to the state agency served only as a supplemental DSO enforcement and collection tool (albeit an important one).  It does not constitute an outright assignment of Ms. Crosson's payment rights under the Family Court orders.  Mr. Bagley did not present evidence or cite to controlling statutes or case law to support his contention that submission of the CSS Form assigned Ms. Grady's Amended Claim to the state agency.  Rather, the Court finds that Rhode Island law requires submission of the CSS Form.  Rhode Island General Laws § 15-9-1(g) provides that "all support orders established or modified in the state . . . be recorded with the Rhode Island family court/department of administration, division of taxation child support computer

enforcement system. The system maintains the official registry of support orders entered in accordance with applicable administrative orders issued by the Rhode Island family court."

Mr. Bagley's remaining arguments are easily dispatched. To qualify as a DSO, there is no statutory requirement that the fees awarded to Ms. Grady on behalf of Ms. Crosson be based upon a finding of "willful and malicious" contempt of the Family Court's orders. It appears that he may be confusing the non-discharge provisions of Code § 523(a)(6)— "willful and malicious injury by the debtor to another entity or to property of another entity"— with the definition of a DSO under § 101(14A). Not only is there no such language contained in § 101(14A), but § 523(a)(5) renders a debt for a DSO nondischargeable regardless of how it arose. It is sufficient that the fees were awarded by the Family Court "in connection with [Ms. Grady's] efforts to enforce the prior Orders of [the Family Court] related to payment of child support, uninsured medical and orthodontic expenses for the minor child, health insurance premiums for the minor child and for payment of previously ordered counsel fees." DSO Order at ¶3.

Finally, Mr. Bagley's argument that it was unreasonable for Ms. Crosson to incur these fees when she had "free services" for the enforcement and collection of his delinquent payments through OCSS is equally meritless. Nothing in the CSS Form precluded Ms. Crosson from engaging Ms. Grady to pursue the Support Obligations that Mr. Bagley failed to pay. Ms. Grady's uncontradicted testimony is that it often takes the state agency months to act when support payments are delinquent. Additionally, the agency will not pursue collection of obligations other than the ordered Child Support and insurance premium payments. Thus, parties entitled to payment of court-ordered medical and other expenses must pursue collection of these obligations themselves or through their attorney. What is unreasonable is Mr. Bagley's insistence that Ms. Crosson wait months to collect the Support Obligations or forego collection

of the Support Related Expenses which he failed to pay.  He has only himself to blame for the incurrence of such fees.

The bottom line is that Ms. Grady's total fees of $12,870.00 are DSOs within the meaning of § 101(14A).  However, because the Amended Claim includes both pre-petition and post-petition awarded fees, only the pre-petition portion of the claim of $11,070.00 can be allowed as a priority claim under § 507(a)(1).  As will be discussed later, the non-payment of the $1,800.00 DSO claim has a different adverse impact for Mr. Bagley.

**V.    The Stay Violation Motion**

Bankruptcy Code § 362 contains the broad provisions of the "automatic stay" with which non-lawyers may be familiar.  *See* 11 U.S.C. § 362(a).  But they may not be aware that there are also 29 enumerated exceptions to the stay as well as other specified limitations.  *See* 11 U.S.C. § 362(b).  Of importance in the present case is the stay exception for DSOs provided by § 362(b)(2)(A)(ii).  The Family Court concluded that the stay did not apply to the fee assessment proceedings.  Although that court has concurrent jurisdiction over such matters, "when faced with a collateral challenge to a state court determination that the stay does not apply the bankruptcy court having jurisdiction over a bankruptcy case in which the stay arises must adjudicate the question anew."  *In re Angelo*, 480 B.R. at 83.

Therefore, the Court starts its analysis with § 362(a)(6), upon which Mr. Bagley relies.  He characterizes Ms. Grady's fee motion as "an act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case…"  He also asserts, albeit erroneously, that the Court found that the automatic stay applied when it denied Ms. Grady's Motion for Relief.

Section 362(a)(6) provides that the filing of a bankruptcy petition operates as a stay, applicable to "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."  This is one of six provisions of § 362(a) which "address actions commenced before a petition is filed or which could have been commenced pre-petition."  *In re Wei-Fung Chang,* 438 B.R. 77, 79 (Bankr. M.D. Pa. 2010).  Generally, actions or claims that arise post-petition are not stayed.  *See* 3 COLLIER ON BANKRUPTCY ¶ 362.03 [3][c] (Richard Levin & Henry J. Sommer eds., 16th ed.).  There are, however, certain limitations on post-petition actions, as provided in § 362(a)(3) and (4). [7]  *See id*.  Specifically, § 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  Therefore, "[a] post-petition creditor has the right to initiate suit against a debtor and obtain a judgment for a post-petition debt, but collection activities directed against property of the estate are barred."  *In re Wei-Fung Chang*, 438 B.R. at 80.

Ms. Grady invokes § 362(b)(2)(A)(ii) in defense of the Stay Violation Motion.  This provision excepts from the automatic stay "the commencement or continuation of a civil action or proceeding . . . for the establishment or modification of an order for domestic support obligations."  11 U.S.C. § 362(b)(2)(A)(ii). [8]  Ms. Grady contends that the filing for fees in the Family Court was excepted from the automatic stay under § 362(b)(2)(A)(ii) as it only sought to establish or modify an order for a DSO.  She further argues that the DSO Order only quantified the total fees she incurred pre-petition, determined that such fees were DSOs, and explicitly

---

[7] Section 362(a)(4) is not germane to this analysis as it stays "any act to create, perfect, or enforce any lien against property of the estate."

[8] Mr. Bagley does not address the actual exception Ms. Grady relies upon in her defense. Instead, he focuses on § 362(b)(2)(B) which excepts from the stay the "collection of a domestic support obligation from property that is not property of the estate."  11 U.S.C. § 362(b)(2)(B).

stayed any enforcement of the order because of the automatic stay.  Mr. Bagley, as the "party

seeking to establish that a judgment was entered in violation of the automatic stay [under]

§ 362(a), bears the burden of proof.  A party seeking damages for a stay violation under . . .

§ 362(k)(1) bears the burden of proving entitlement to damages.  In each instance, the standard is

a preponderance of the evidence." *In re Angelo*, 480 at 83.

A.    Analysis

Mr. Bagley has not satisfied his burden. Having determined that the fees listed in the

Amended Claim are pre-and post-petition DSOs under § 101(14A), the Court concludes that Ms.

Grady did not violate the stay.  The filing of her fee request was to establish the amount of such

fees, and that action as well as the resulting DSO Order are excepted from the automatic stay by

§ 362(b)(2)(A)(ii).  The sole purpose of seeking quantification of the fees and the DSO

determination in the Family Court was to enable Ms. Grady to update her Initial Claim so that

the priority claim could be paid under a confirmed chapter 13 plan.  For the same reason, the

inclusion of Ms. Grady's post-petition fees related to the bankruptcy proceeding is equally

exempt from the stay, even though the Family Court declined to assess them as a DSO.  Because

they were incurred post-petition, such action is not barred by § 362(a)(6), which applies only to

pre-petition debt.  Nor did they fall outside the scope of the exception under § 362(b)(2)(A)(ii).

As stated, her actions were not post-petition collection efforts against property of the estate.

Indeed, the DSO Order was narrowly tailored to avoid a potential stay violation and clearly

stayed the enforcement of the order during the bankruptcy case.

## VI.    Plan Confirmation

Ms. Grady objects to confirmation of the Third Amended Plan under §§ 1322(a)(1) and

(a)(2), and 1325(a)(1), (3), (6), (7), and (8).  Her primary arguments are threefold: (a) Mr.

Bagley's failure to provide for the payment of her DSO in the plan as mandated by § 1322(a)(2);

(b) the unpaid $1,800.00 post-petition DSO debt, a requirement for plan confirmation under

§ 1325(a)(8); and (c) the lack of the plan's feasibility.

   *A. Full Payment of Priority Claims*

   Section 1322(a)(2) requires chapter 13 plans to provide full payment of priority claims.

Because a pre-petition DSO is afforded priority under § 507(a)(1), a plan cannot be confirmed

unless it provides for full payment of priority claims over the term of the plan.  *See In re

Andrade,* 662 B.R. at 901.  There are only two exceptions to this mandate: (1) when the holder of

the priority claim consents to different treatment; or (2) when the priority claim is a DSO that has

been assigned to or is owed directly to a governmental unit, so long as the plan provides that all

of the debtor's projected disposable income over five years will be applied to plan payments.

*See* 8 COLLIER ON BANKRUPTCY ¶ 1322.03 (interpreting § 1322(a)(2) and (4)).

   The Third Amended Plan does not satisfy § 1322(a)(2).  It does not provide payment of

Ms. Grady's Amended Claim in full as a priority claim.  Mr. Bagley argues that the Third

Amended Plan is confirmable even if the Amended Claim is a DSO, citing § 1322(a)(4).  That

section in turn refers to § 507(a)(1)(B), which focuses upon a DSO claim that has been assigned

to a governmental unit or "owed directly to or recoverable by a governmental unit."  Based on

the Court's earlier conclusion that the claim is held by Ms. Grady and was not assigned to a

government agency (OCCS), Mr. Bagley's argument falls flat.  The exception in § 1322(a)(4)

does not apply.

Further, his reliance on *In re Clark*, 921 F.3d 566, 570 (5th Cir. 2019)[9] is misplaced.

*Clark* turned on Illinois law and is distinguishable from the present case. Here, the Court has

already explained why the CSS Form is not an assignment of Ms. Grady's claim. It is a

registration requirement and only provides some tools for enforcement of the Family Court's

DSO orders. And unlike the movants in *Clark*, Ms. Grady seeks attorney's fees that she accrued

on behalf of Ms. Crosson while pursuing enforcement of support orders and collection of unpaid

Support Obligations. Ms. Grady is the proper holder of the DSO set forth in the Amended Claim

and Mr. Bagley's plan must provide for its treatment as a priority claim.

> B.      *The Outstanding Post-Petition DSO*

Ms. Grady is also correct that the Third Amended Plan is not confirmable because it does

not comply with § 1325(a)(8). That section requires that "the debtor has paid all amounts that

are required to be paid under a domestic support obligation and that first become payable after

the date of the filing of the petition if the debtor is required by a judicial or administrative order,

or by statute, to pay such domestic support obligation." 11 U.S.C. § 1325(a)(8). As of the

evidentiary hearing, Mr. Bagley had not paid the $1,800.00 post-petition DSO owed Ms. Grady,

and to date there is nothing in the record establishing that it has been paid. In summary, the

Third Amended Plan is not confirmable because it does not provide for payment of Ms. Grady's

pre-petition DSO claim and her post-petition DSO claim remains unpaid.

Given that the Third Amended Plan fails to comply with § 1322(a)(2) and § 1325(a)(8),

the Court's plan confirmation analysis could end here. However, considerable evidence was

adduced at the evidentiary hearing on the feasibility of the Third Amended Plan. That issue may

---

[9] During the hearing, Mr. Bagley also cited *In re Davis*, 194 F.3d 570 (5th Cir. 1999), which held that the administratrix of a probate estate of a person shot and killed by a chapter 7 debtor qualified as a "creditor" with standing to bring an adversary proceeding to declare the debt nondischargeable. The *Davis* case is facially inapplicable to the facts of this case and does not support Mr. Bagley's position.

impact the Court's consideration of Ms. Grady's pending motion to convert the case to chapter 7.

Accordingly, a brief discussion of the plan's feasibility is appropriate.

      *C.*     *Feasibility of Third Amended Plan*

      The Bankruptcy Code requires the Court to find that a proposed chapter 13 plan is

feasible before it can be confirmed.  *See* 11 U.S.C. § 1325(a)(6).  "By far the most important

criterion for the confirmation of a chapter 13 plan in terms of promoting the success of chapter

13 proceedings is [§] 1325(a)(6)'s requirement that the court determine whether the chapter 13

debtor will be able to make all payments under the plan and comply with all other provisions of

the plan."  *See* 8 COLLIER ON BANKRUPTCY ¶ 1325.07.  The burden of establishing that the debtor

has sufficient regular income to fund a plan and can meet the feasibility requirement of

§ 1325(a)(6) rests squarely on the debtor.  *See In re Wark*, 542 B.R. 522, 539 (Bankr. D. Kan.

2015).  To confirm a plan, the bankruptcy court must determine that the debtor's plan has "a

reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary

resources to make all payments as directed by the plan*.*"  *First Nat'l Bank of Boston v. Fantasia

(In re Fantasia)*, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997).  For a plan to be feasible, a debtor

should be current in plan payments and be able to maintain a budget that allows continued plan

payments as well as ordinary living expenses, including mortgage payments if applicable.  *See In

re Wark*, 542 B.R. at 540.

      Setting aside Ms. Grady's Amended Claim, it is abundantly clear from the record and Mr.

Bagley's testimony that he is constrained by an extremely tight budget just to enable his plan

payments.  He has forgone electric service to his residence, which most people consider essential

to a minimal standard of living.  The Court is skeptical of Mr. Bagley's protestations that he does

not need this service as there are other ways to light the residence and his explanation that when

31

it is dark he goes to bed.  More probable is that either his service was shut off due to non-payment, or he terminated the service to reduce his living expenses so he could make his plan and mortgage payments.

The tip off here to the plan's infeasibility is Mr. Bagley's current $12,000.00 default in his post-petition mortgage payments.  He did not explain what happened to the $12,000.00 in mortgage payments he did not make.  Although the Third Amended Plan proposes to maintain the post-petition monthly mortgage payments, the evidence and the record demonstrates his inability to do so, without considering the increase in his monthly plan payments that will be required to pay Ms. Grady's DSO claim.[10]  Essentially, Mr. Bagley has made his plan payments to the Trustee at the expense of his on-going post-petition mortgage payments.  How he will cure this post-petition arrearage is unknown given the withdrawal of the Second LM Motion.

The Court gives little credence to Mr. Bagley's vague assertion that his income will increase because of sales commissions he expects to earn.  As noted earlier, Mr. Bagley produced no evidence about such commissions, could not provide the amount of commissions he had allegedly accrued, and did not provide evidence about the amount of commissions he expected to earn in the future.  The Court shares the Trustee's concerns about the feasibility of the Third Amended Plan and finds that it is simply not feasible.

## VII.    Conclusion

For the detailed reasons discussed in this decision, the Court holds that: (a) Ms. Grady's Amended Claim, both the pre-petition and post-petition components, is a DSO as defined by the Bankruptcy Code; (b) the Amended Claim is allowed as a first priority claim in the amount of $11,070.00; (c) Ms. Grady did not violate the automatic stay when pursuing quantification of her

---

[10] Despite the Third Amended Plan providing to cure pre-petition mortgage arrears, that arrearage was capitalized under the modified mortgage through Mr. Bagley's first loan modification.

claim and its characterization as a DSO by the Family Court; and (d) confirmation of the Third

Amended Plan is denied.  The Court will enter separate orders on each of these determinations

consistent with this decision.


Date:   October 29, 2025

Judge Diane Finkle
Bankruptcy Judge